# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ROBERTO CISNEROS, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| NOVAN, INC., NATHAN STASKO, RICHARD D. PETERSON, ROBERT A. INGRAM, W. KENT GEER, ROBERT J. KEEGAN, G. KELLY MARTIN, SEAN MURPHY, and JOHN W. PALMOUR, | ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Roberto Cisneros ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Novan, Inc. ("Novan" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Case 1:17-cv-01066-CCE-JEP   Document 1   Filed 11/24/17   Page 1 of 30

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Novan's stock: (1) pursuant and/or traceable to Novan's false and misleading Registration Statement and Prospectus, issued in connection with the Company's initial public offering on or about September 26, 2016 (the "IPO" or the "Offering"); and/or (2) on the open market between September 26, 2016 and August 1, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Novan is a clinical-stage drug development company that focuses on the development and commercialization of nitric oxide-based therapies in dermatology. Novan was incorporated in January 2006 under the laws of Delaware and its subsidiaries were organized in May 2015 under the laws of North Carolina.

3.      Founded in 2006, the Company is headquartered in Morrisville, North Carolina and its stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "NOVN."

4.      Leading up to and during the Class Period, Defendants represented that Novan had commenced two identically designed Phase 3 clinical trials of SB204, a once-daily, topical gel for the treatment of acne vulgaris. SB204 was the Company's lead product candidate, and information regarding its development and commercialization was important to investors.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business and outlook, specifically regarding SB204. Specifically, (i) Defendants repeatedly stated that Novan had commenced and performed two identically designed Phase 3 clinical trials of SB204; (ii) Defendants falsely stated that the two

2

Phase 3 clinical trials were identical and omitted specific facts as to why the two critical trials were, in fact, not identical; and (iii) as a result for the foregoing, the Company's outlook and expected financial performance were not accurately represented to the market at all relevant times.

6.     During the Class Period, the price of Novan stock climbed significantly above the IPO price of $11.00 per share, reaching as high as $29.09 on December 7, 2016.

7.     Before the market opened on January 27, 2017, Novan announced the top-line results of its two "identical" Phase 3 clinical trials of SB204. Although the drug reached all of its goals in one of the trials, dubbed NI-AC302, it failed to beat a placebo in the other separate Phase 3 study, called NI-AC301.

8.     On news of these discordant results in what were described to be two identical studies, the price of Novan stock fell sharply. After closing at $18.70 on January 26, 2017, the stock opened at $4.50 per share on January 27, 2017, fell to a low of $3.52, and ultimately closed at $4.86, a decline of 74%, on abnormally high trading volume of more than eight million shares.

9.     Subsequent disclosures regarding SB204 demonstrated that the two Phase 3 clinical trials of SB204 were not "identical."

10.     Following these disclosures, several executives left the Company. On March 22, 2017, Novan announced that its Chief Financial Officer ("CFO"), Defendant Richard Peterson ("Peterson"), was leaving and would be replaced, "effective immediately," by interim CFO William L. Hodges ("Hodges"). On May 5, 2017, Novan disclosed that the Company's Chief Medical Officer ("CMO"), M. Joyce Rico ("Rico"), had resigned. Then, on June 5, 2017, Novan announced that it was replacing its Chief Executive Officer ("CEO") and co-founder, Defendant Nathan Stasko ("Stasko"), with G. Kelly Martin ("Martin"), a member of the Company's Board of Directors ("Board"), who would become interim CEO. Novan also announced that it was laying

Case 1:17-cv-01066-CCE-JEP   Document 1   Filed 11/24/17   Page 3 of 30

off 20% of its workforce and that despite previously assuring investors that it was committed to SB204, Novan was executing a plan to turn its focus to earlier-stage compounds.

11.     Following the Company's June 5, 2017 disclosures, the price of Novan stock fell 5% to close at $4.64 that day. The stock extended its losses on June 6, 2017, falling 4% to close at $4.45.

12.     Additional disclosures on August 2, 2017 informed the market that Novan would be retreating further from SB204, stating that Novan's "[p]rimary clinical focus over the next 24 months" would be "antiviral clinical work in EGW and Molluscum" and that the "[a]cne indication and path forward [would] be largely driven by regulatory clarity." On this news, the price of Novan stock declined from $5.48 on August 1, 2017, to $4.54 on August 2, 2017, a drop of more than 17%.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4

16.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.  Novan's principal executive offices are located within this Judicial District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff, as set forth in the attached Certification, incorporated herein by reference, acquired Novan stock as described therein, and suffered damages as a result of the conduct alleged herein.

19.     Defendant Novan is incorporated in Delaware with its principal executive offices located at 4105 Hopson Road, Morrisville, North Carolina 27560.  Novan's stock trades on the NASDAQ under the ticker symbol "NOVN."

20.     Defendant Nathan Stasko served as the Company's President and CEO, and is also a member of Novan's Board. Stasko was replaced as CEO on June 5, 2017, but remained with the Company. Stasko signed the Registration Statement used in connection with the IPO.

21.     Defendant Richard D. Peterson served as the Company's CFO, until he was replaced, effectively immediately, on March 22, 2017, when the Company announced it would appoint an interim CFO and search for a permanent replacement. Peterson signed the Registration Statement used in connection with the IPO.

22.     Defendant Robert A. Ingram ("Ingram") is a member of Novan's Board and was named Chairman in February 2016. Ingram signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Ingram's behalf.

23.     Defendant W. Kent Geer ("Geer") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Geer's behalf.

24.     Defendant Robert J. Keegan ("Keegan") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Keegan's behalf.

25.     Defendant G. Kelly Martin is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Martin's behalf.

26.     Defendant Sean Murphy ("Murphy") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Murphy's behalf.

27.     Defendant John W. Palmour, Ph.D. ("Palmour") is a member of Novan's Board and signed the Registration Statement used in connection with the IPO, via Stasko using his power-of-attorney to sign on Palmour's behalf.

28.     The Defendants referenced above in ¶¶ 20-27 are sometimes referred to herein as the "Individual Defendants." Each of the Individual Defendants acted and/or made the statements detailed herein in his capacity as an officer and/or director of Novan and as signatories to the Registration Statement used in connection with the IPO.

6

29.     Novan and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

30.     Novan describes itself as a late-stage pharmaceutical company focused on "redefining the standard of care in dermatology through the development and commercialization of innovative therapies using [Novan's] nitric oxide releasing platform."  According to Novan, nitric oxide plays a vital role in the natural immune system response against microbial pathogens and is an important regulator of inflammation. Novan states that the two key components of its nitric oxide platform are Nitricil technology, which drives the creation of "new chemical entities" or "NCEs," and its topical formulation science, both of which are used to "tune [Novan's] product candidates for specific indications."

31.     There is, however, only one FDA approved use of nitric oxide, which is for the treatment of pulmonary hypertension in neonatal infants with nitric oxide gas. However, the delivery of nitric oxide from a gas tank is inconvenient and limits practical applications. The scarcity of nitric oxide-based products is due to the historical challenges associated with developing safe and effective approaches for the chemical storage and controlled release of a gas for therapeutic applications. Synthetic approaches for creating molecules that store nitric oxide in solid form have significant limitations that have prevented the translation of these laboratory chemistries into commercially viable products. According to Novan, some of the key limitations include:

- **Lack of tunability** – Therapeutic delivery of nitric oxide to patients at safe and effective levels requires the ability to control the release rate to selectively modulate a specific disease pathology.  Other chemical

approaches release or donate nitric oxide either too fast or too slow, rendering them potentially unsafe or therapeutically ineffective.

- **Unfavorable stability profile** – Most nitric oxide-loaded molecules in development decompose too rapidly, prematurely releasing nitric oxide and impairing shelf life stability. Based on the chemistries involved, slight increases in temperature, exposure to ambient humidity or irradiation with light all significantly diminish nitric oxide potency.

- **Low storage capacity** – Other small molecule strategies only permit the loading, or storage, of one or two units of nitric oxide per unit of drug, leaving them with an inability to deliver sufficient therapeutic quantities of nitric oxide to the desired site. Conversely, macromolecular scaffolds to date have had limited storage sites to bind nitric oxide as a percentage of total weight.

- **Lack of targeting** – Other nitric oxide-based approaches are primarily small molecule-based and are limited in their ability to be delivered to or target specific tissues, and the organ destination or systemic half-life is dictated by the molecule to which nitric oxide was attached.

- **Backbone toxicity** – Several small molecules developed in laboratory settings used to store nitric oxide have never been translated into clinical use due to the carcinogenic potential of nitrosamines or risk of cyanide poisoning from sodium nitroprusside.

32. At all relevant times, the Company's lead product candidate was SB204, a once-daily, topical gel for the treatment of acne vulgaris. Novan represented to investors that the Company's nitric oxide "platform" harnessed the potential of nitric oxide in a manner that "leads to the creation of differentiated product candidates that address all these limitations [of nitric oxide] by (1) engineering tunable NCEs using [Novan's] Nitricil technology and (2) using [Novan's] formulation science to customize the drug delivery method for the anatomical location of a skin disease."

33. In the first quarter of 2016, the Company commenced what it described as "two identically designed Phase 3 pivotal clinical trials of SB204" to evaluate its safety and efficacy. The Company represented to investors that it completed enrollment in both trials ahead of schedule by randomizing the last patient in September 2016, bringing the total number of enrolled patients

8

to 2,600. Per the study protocol, the last patient randomized would be treated for 12 weeks. The Company represented to investors that it expected to report top-line results from the two parallel trials in the first quarter of 2017, and that "[a]ssuming successful completion of [Novan's] Phase 3 clinical trials and [Novan's] longterm safety study, [Novan was] targeting submission of [its] new drug application, or NDA, for SB204 to the U.S. Food and Drug Administration, or the FDA, by the end of 2017."

34.     On August 24, 2016, Novan filed a Registration Statement on Form S-1 with the SEC. An amended Registration Statement was filed on September 8, 2016, and a second amended Registration Statement was filed on September 20, 2016. On September 20, 2016, the SEC declared the Registration Statement effective, pursuant to which the Company offered 4,100,000 shares of its common stock for $11.00 each. The Prospectus was filed with the SEC on September 22, 2016.

35.     Novan common stock was listed and began actively trading on the NASDAQ on September 26, 2016. The Company sold an aggregate of 4,715,000 shares of common stock under the Registration Statement on Form S-1 declared effective by the SEC on September 20, 2016, at a public offering price of $11 per share, for aggregate proceeds of $51,865,000. After deducting underwriter discounts and commissions, net proceeds to the Company were $44,595,000.

**Materially False and Misleading Statements Issued During the Class Period**

36.     The Class Period begins on September 26, 2016, when Novan filed its Registration Statement.  The Offering Documents described Novan's business and the nature of each of its products, set forth its historical financial data, described SB204, and provided the terms of the IPO. The Offering Documents incorporated by reference the Prospectus and the exhibits to the Registration Statement. The Registration Statement was signed by the Individual Defendants.

9

37.     The Registration Statement stated, in relevant part:

Our lead product candidate is SB204, a cosmetically elegant topical gel that targets multiple mechanisms of action for the treatment of acne vulgaris, the most common skin disease in the United States. ***We commenced two identically designed Phase 3 pivotal clinical trials in the first quarter of 2016 and expect to report top-line results from these pivotal trials in the first quarter of 2017.*** Assuming successful completion of a long-term safety study in the second half of 2017, we are targeting submission of a new drug application, or NDA, for SB204 by year-end 2017.

38.     Discussing SB204 and its treatment of acne, the Registration Statement disclosed:

We are developing our lead product candidate, SB204, as a once-daily, fastacting, topical first-line monotherapy for the treatment of acne vulgaris. ***In the first quarter of 2016, we commenced two identically designed Phase 3 pivotal clinical trials of SB204 in which we expect to enroll a total of 2,600 patients with acne vulgaris, and we expect top-line results in the first quarter of 2017.*** Acne vulgaris is the most common skin disease in the United States, affecting approximately 40 to 50 million Americans annually, according to the American Academy of Dermatology. We believe the current treatment landscape significantly underserves patient needs due to the difficulty of balancing efficacy, systemic safety and cutaneous tolerability. Prior to initiating our Phase 3 trials, our 630-patient clinical program for SB204 included one first-in-human trial, six Phase 1 clinical trials and two Phase 2 clinical trials involving patients suffering from acne vulgaris, in each of which SB204 was well tolerated. In each of our Phase 2 clinical trials, we observed statistically significant reductions in both inflammatory and non-inflammatory lesion counts after 12 weeks of treatment. ***We designed the protocol for our Phase 3 clinical trials based on feedback we received from the U.S. Food and Drug Administration, or FDA, during our end-of-Phase 2 meeting in September 2015. Assuming successful completion of our Phase 3 clinical trials and our long-term safety study, we are targeting submission of our NDA for SB204 to the FDA by the end of 2017.***

39.     Describing the Phase 3 clinical trials for SB204, the Registration Statement added:

The conduct of a Phase 3 clinical trial is a complex process that differs from clinical trials conducted in earlier phases. While some of our employees have conducted Phase 3 clinical trials in the past while employed at different companies, we, as a company, have not conducted a Phase 3 clinical trial before, and as a result, may require more time and incur greater costs than we anticipated. ***We commenced two identically designed Phase 3 pivotal clinical trials of our lead product candidate, SB204, for the treatment of acne vulgaris in the first quarter of 2016.*** Failure to complete, or delays experienced in, our clinical trials, or failure to commence any planned clinical trials would prevent us from, or delay us in, obtaining regulatory approval of and commercializing our product candidates.

10

40.     Further discussing the Company's business strategy, the Registration Statement

added:

> Our strategy is to develop and commercialize novel nitric oxide-based therapies that redefine the standard of care in dermatology. We are focused on creating topical, dermatological therapies in indications with underserved patient populations and well-defined clinical and regulatory development pathways. In order to pursue our strategy, we plan to:
>
> - ***Complete development of our late-stage product candidate, SB204 and submit for regulatory approval in the United States. In the first quarter of 2016, we initiated two identically designed Phase 3 pivotal clinical trials for our lead product candidate, SB204 to treat acne vulgaris, and we expect to report top-line results in the first quarter of 2017. These trials are designed to further evaluate the safety and efficacy of SB204 in 2,600 patients with acne vulgaris. Assuming successful completion of our Phase 3 pivotal clinical trials and our long-term safety study, we will target submitting our NDA to the FDA for SB204 by the end of 2017.***

41.     The Registration Statement also described the protocol for the Phase 3 clinical trials

of SB204, and stated, in relevant part:

> ***The protocol for our two Phase 3 pivotal clinical trials is based on feedback from our end-of-Phase 2 meeting with the FDA in September 2015.***
>
> Assuming successful completion of our Phase 3 pivotal clinical trials and our long-term safety study, we will target submission of our NDA to the FDA for SB204 by the end of 2017.
>
> * * *
>
> We believe that SB204 has the potential to redefine the standard of care in acne vulgaris, and if approved will be the first NCE specifically developed for the treatment of acne vulgaris in more than 20 years.
>
> * * *
>
> Phase 3 Clinical Program
>
> ***Based on the results from our development program to date, we initiated two identically designed Phase 3 pivotal clinical trials in the first quarter of 2016 with SB204 4% once-daily. We have completed an end-of-Phase 2 meeting with the FDA and submitted the protocols for the Phase 3 program under a special protocol assessment, or SPA, for review by the FDA. We have reached agreement with the FDA on the primary endpoints for our Phase 3 clinical trials, but do not***

11

*intend to pursue a full formal SPA agreement with the FDA.* We have also completed the non-clinical studies and chemistry, manufacturing and controls, or CMC, activities required to support initiation of the following clinical trials:

- NI-AC301 and NI-AC302: two multi-center, randomized, double-blind vehicle-controlled Phase 3 clinical trials assessing the safety and efficacy of SB204 4% dosed once-daily in patients with acne vulgaris over 12 weeks. Each of these trials will consist of approximately 1,300 patients.

- NI-AC303: a long-term multi-center, open-label safety trial assessing the safety of treatment with a SB204 4% once-daily for up to 40 weeks, in eligible patients who have completed 12 weeks of treatment in the NI-AC301 or NI-AC302 trials.

* * *

The co-primary efficacy endpoints in our Phase 3 clinical trials are:

- the absolute change in inflammatory lesion counts from baseline to week 12 or ET;

- the absolute change in non-inflammatory lesion counts from baseline to week 12 or ET; and

- the proportion of success according to the dichotomized investigator global assessment, or IGA. A patient will be considered a success if the IGA at week 12/ET is either "clear", with a score of 0, or "almost clear", with a score of 1, and is at least two grades below the baseline score.

42. The IPO Prospectus added similar information regarding the SB204 Phase 3 clinical trials. Specifically, it included statements regarding the Company's discussions with the FDA over the Phase 3 clinical trial design for SB204 and that the Company did not have a special protocol assessment from the FDA, stating, in relevant part:

We currently do not have an SPA in place with respect to any of our product candidates. We have previously made such a submission for an SPA to the FDA in connection with the design of our Phase 3 clinical trials for SB204. *We received feedback from the FDA on our Phase 3 trial design that we believed was sufficient to move forward on the Phase 3 development program without further pursuing an SPA.* We recognize that the feedback obtained in connection with the SPA discussions does not constitute a formal SPA or a binding declaration from the FDA that it agrees with the Phase 3 clinical trials' design, clinical endpoints or statistical analysis plan. We may, in the future, decide to make a submission for an SPA for any of our current or future product candidates.

12

43. The Offering Documents, including the materials incorporated therein by reference, were negligently prepared and, as a result, contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made not misleading at the time they were made, and were not prepared in accordance with the rules and regulations governing their preparation. The Offering Documents:

(a) falsely described the two Phase 3 clinical trials for SB204, NI-AC301, and NI-AC302, as "identical," when, in fact, one of the trials included a specific patient population – women on oral contraceptive prescriptions – that was not present in the other clinical trial;

(b) omitted disclosure of key aspects of the Company's business, specifically distinctions within the Company's SB204 product and Phase 3 clinical tests that were requested by the FDA, which undermined the likelihood that SB204 would achieve its study endpoints;

(c) omitted that the FDA had encouraged Novan, as part of its discussions regarding the SPA for the Phase 3 trials, to evaluate treatment effectiveness of SB204 in women on oral contraceptive prescriptions, such as Yaz or Ortho-Tricyclen, and that the inclusion of such women in one of the SB204 trials, but not the other, was likely to impact the Phase 3 clinical trial results;

(d) omitted information regarding SB204, leaving investors unable to accurately assess the validity of Defendants' statements regarding the status of SB204 and its potential for commercialization; and

(e) as a result of the foregoing, Defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times.

44. On November 14, 2016, the Company issued a release reporting its financial results for the third quarter ended September 30, 2016. The release stated, in relevant part:

Novan is developing:

- SB204 for the treatment of acne vulgaris, or acne. ***The Company announced Sept. 28, 2016, that the two identically designed Phase 3 pivotal clinical trials for SB204 were fully enrolled ahead of schedule. Novan expects to announce top-line results from these parallel pivotal trials in the first quarter of 2017. Assuming successful completion of these Phase 3 pivotal trials and the long-term safety study, the Company is***

13

> *targeting submission of a new drug application for SB204 to the U.S.*
> *Food and Drug Administration by the end of 2017.*

45.     On November 14, 2016, the Company filed with the SEC its quarterly report on

Form 10-Q for the third quarter ended September 30, 2016 ("3Q16 10-Q"). The 3Q16 10-Q was

signed by Stasko and Peterson, and included Sarbanes-Oxley certifications signed by each of them

attesting that the 3Q16 10-Q did not contain any untrue statements of material fact or omit any

material fact necessary to make the statements made not misleading. Regarding SB204, the 3Q16

10-Q stated, in relevant part:

> The current activities, recent developments, and key milestones related to our
> clinical stage drug candidates are summarized below:
>
> • SB204 for the Treatment of Acne Vulgaris (Phase 3) – We are developing
>   our lead product candidate, SB204, as a once-daily, topical monotherapy
>   for the treatment of acne vulgaris. In the first quarter of 2016, we
>   commenced two identically designed Phase 3 pivotal clinical trials of
>   SB204 to evaluate safety and efficacy. We completed enrollment in both
>   trials ahead of schedule by randomizing the last patient in September 2016,
>   bringing the total number of enrolled patients to 2,600. Per the study
>   protocol, the last patient randomized will be treated for 12 weeks. We
>   expect to report top-line results from the two parallel trials in the first
>   quarter of 2017. Assuming successful completion of our Phase 3 clinical
>   trials and our long-term safety study, we are targeting submission of our
>   new drug application, or NDA, for SB204 to the U.S. Food and Drug
>   Administration, or the FDA, by the end of 2017.
>
> We also completed a pharmacokinetic study in adolescents with moderate to severe
> acne during the third quarter of 2016. Patients were treated with SB204 4% once
> daily for 21 days. There was no detectable systemic exposure to the parent
> compound, NVN1000, and no change in endogenous nitrate levels after single or
> repeat dosing. The exposure data from this study is consistent with our previously
> reported pharmacokinetic data in adults, which also demonstrated no detectable
> systemic exposure to the parent compound, NVN1000, and no change in nitrate
> levels after topical treatment with SB204.

46.     The statements referenced in ¶¶ 36-45 were materially false and misleading because

Defendants made false and/or misleading statements, as well as failed to disclose material adverse

facts about the Company's business, operational and compliance policies. Specifically, (i)

14

Defendants repeatedly stated that Novan had commenced and performed two identically designed Phase 3 clinical trials of SB204; (ii) Defendants falsely stated that the two Phase 3 clinical trials were identical and omitted specific facts as to why the two critical trials were, in fact, not identical; and (iii) as a result for the foregoing, the Company's outlook and expected financial performance were not accurately represented to the market at all relevant times..

47.　　During the Class Period, the price of Novan stock climbed significantly from the IPO price, reaching as high as $29.09 on December 7, 2016.

## The Truth Begins To Emerge

48.　　On January 17, 2017, the Company announced entry into an exclusive license agreement with Sato Pharmaceutical Co., Ltd., a Japanese company, for the exclusive rights to develop and commercialize SB204 in Japan. The announcement stated, in relevant part:

> "We are pleased to announce this agreement with Sato," said Nathan Stasko, PhD, President and Chief Executive Officer of Novan. "Sato has established a strong position in the Japanese dermatology market. This new partnership, coupled with Sato's market-leading position in topical acne care with Dalacin T® and recent launch of Luconac® for onychomycosis, clearly illustrates Sato's commitment to improving the quality of life of patients with skin diseases. We believe this deal underscores the potential of SB204 as a truly first-in-class monotherapy for the treatment of acne and is consistent with Novan's strategy to remain focused on commercializing our product candidates in the United States while establishing partnerships to unleash nitric oxide's therapeutic potential worldwide. We look forward to a long and prosperous partnership with our friends at Sato."

> The SB204 development program includes two completed Phase 2 studies, in which topical application of a nitric oxide-releasing gel has demonstrated statistically significant percent reductions in acne lesions, the primary efficacy analyses required for recent topical acne drugs approved by Japan's Ministry of Health, Labor and Welfare. Additionally, the favorable tolerability profile of SB204 is a particularly attractive attribute for the Japanese patient population that has experienced a greater incidence of skin irritation with retinoid and benzoyl peroxide therapies than the U.S. population.

49.　　Before the market opened on January 27, 2017, Novan announced the top-line results of its two "identical" Phase 3 clinical trials of SB204. Although the drug reached all of its

15

goals in one of the trials, dubbed NI-AC302, it failed to beat a placebo in the other separate Phase 3 study, called NI-AC301.

50. On news of the discordant results in what were described to be two identical studies, the price of Novan stock dropped. After closing at $18.70 on January 26, 2017, the stock opened at $4.50 per share on January 27, 2017, fell to a low of $3.52, and ultimately closed at $4.86, a decline of 74%, on abnormally high trading volume of more than eight million shares.

51. Subsequent disclosures regarding SB204 demonstrated that the two Phase 3 clinical trials of SB204 were not "identical."

52. Before the market opened on March 6, 2017, the Company issued a release providing an update on SB204. The update told investors that after "further analysis of the results from the NI-AC301 and NI-AC302 pivotal clinical trials for the Company's topical nitric oxide-releasing product candidate, SB204, it intends to proceed with the SB204 development program." In a presentation that accompanied the release, the Company stated that the SB204 Phase 3 trials involved approximately "2,600 patients enrolled in two, identical studies across 110 sites in the US." The release and the presentation indicated to investors that the Company would have a "Pre-NDA Meeting" with the FDA in the third quarter of 2017 and that Novan remained committed to SB204 for the treatment of acne.

53. On March 20, 2017, the Company announced its fourth quarter and full year 2016 financial results. The release stated, in relevant part:

> Novan is currently evaluating a number of financing options, from nondilutive partnership opportunities across the Company's pipeline to traditional private and public equity raises, to provide additional funding that will be required to support development of SB204 through the FDA process, including the cost of an additional well-controlled trial, and to fund operations for platform programs beyond 2017, including the cost of two Phase 3 pivotal clinical trials of SB206.
>
> "We are pleased to announce the results of Novan's first year-end as a public company," said Nathan Stasko, Ph.D., President and Chief Executive Officer of

16

Novan. "This past year we were able to complete our IPO in extremely challenging market conditions and meaningfully increased our drug development infrastructure. As a result, we were able to advance our nitric oxide platform by initiating our Phase 3 clinical program for SB204, completing our Phase 2 clinical trial for SB206, commencing our Phase 2 proof-of-concept trial for SB208 and generating preclinical data that encourages us to accelerate clinical development of our SB414 candidate for inflammatory skin diseases. As we look ahead into 2017, we are eager to expand upon the budding knowledge of nitric oxide's role in dermatological diseases and to provide new evidence to support advancing each of our pipeline candidates. In the second quarter alone, we expect to hold our SB206 end-of-Phase 2 meeting with the U.S. Food and Drug Administration, or FDA, release top-line results of our SB208 anti-fungal Phase 2 trial and submit our Investigational New Drug application, or IND, for SB414 as a potential treatment for patients with mild to moderate psoriasis. Each of these clinicalstage candidates may provide non-dilutive financing opportunities as we look to expand our number of industry collaborations. Additionally, we look forward to our pre-submission meeting with the FDA for SB204 and continuing toward our goal of developing and launching the first new chemical entity approved for the treatment of acne in over 20 years."

                                               ***

Novan intends to pursue a pre-submission meeting with the FDA to discuss the entirety of the SB204 development program in the third quarter of 2017, which could lead to a new drug application, or NDA, submission in the first quarter of 2018, assuming among other things successful completion of the Company's ongoing long-term safety study. Following the pre-NDA meeting, Novan expects to finalize plans for an additional well-controlled clinical trial with SB204 to be conducted in parallel with the FDA review to support NDA approval.

54.    In its annual report for fiscal 2016 filed with the SEC on March 20, 2017 ("2016 10-K"), the Company told investors that the two "identical" clinical trials for SB204 included different patient populations. Specifically, the 2016 10-K stated "[w]e believe the inclusion of these 14 patients on birth control, 8 in the SB204 arm of the trial and 6 in the vehicle arm, contributed to the reduced separation from vehicle in the NI-AC301 trial observed for inflammatory lesions in our primary analysis." It also stated that "[t]he FDA had encouraged us, as part of our discussions regarding an SPA, to evaluate treatment effectiveness in women on oral contraceptive prescriptions with an acne indication." The 2016 10-K added, "Whether or not this subset of patients will be included in future trials is still to be determined." The Company's SPA

discussions with the FDA, however, occurred prior to Novan's IPO, and none of Defendants' statements prior to the 2016 10-K disclosed that the FDA had advised Novan to include a unique patient population in one of the "identical" Phase 3 clinical trials for SB204.

55.     After revealing that the two Phase 3 clinical trials for SB204 were not identical, on March 22, 2017, the Company announced "adjustments to the executive management team." Specifically, Novan announced that CFO Peterson was "leaving to pursue other business interests" and would be replaced, "effective immediately," by interim CFO Hodges. The release also stated that Novan was creating a new executive position of Chief Development Officer ("CDO") to oversee "the tactical execution of clinical trials and the establishment of statistics and data management functions at the Company." The Company indicated the new CDO would "team with Dr. Joyce Rico, Chief Medical Officer, as Novan prepares for upcoming interactions with the . . . FDA, including the planned presubmission meeting regarding a potential new drug application for SB204."

56.     On April 4, 2017, the Company announced formation of a new "Advisory Council" comprised of "key opinion leaders with broad expertise in dermatology" to "provide medical advice and drug-development insight to the Company's senior leadership team and board of directors."

57.     On May 5, 2017, Novan filed an 8-K with the SEC, signed by interim CFO Hodges, disclosing that the Company's CMO, Rico, had resigned for "Good Reason" as defined in her less than one-year-old employment agreement with Novan dated August 25, 2016.

58.     On May 12, 2017, the Company filed with the SEC on Form 10-Q its quarterly report for the first quarter ended March 31, 2017 ("1Q17 10-Q"). The 1Q17 10-Q included a "going concern" warning, stating:

The Company has concluded that these conditions raise substantial doubt about the Company's ability to continue as a going concern within one year from the date that these financial statements are issued. To mitigate these conditions, the Company needs and intends to raise additional funds through equity or debt financings or generate revenues from collaborative partners prior to the commercialization of the Company's product candidates. There can be no assurance that the Company will be able to obtain additional debt or equity financing or generate revenues from collaborative partners, on terms acceptable to the Company, on a timely basis or at all. The failure of the Company to obtain sufficient funds on acceptable terms when needed could cause the Company to alter or reduce its planned operating activities, including but not limited to delaying planned product candidate development activities, to conserve its cash and cash equivalents. Such actions could delay development timelines and have a material adverse effect on the Company's results of operations and financial condition. Additionally, there is no assurance that the Company can achieve its development milestones or that its intellectual property rights will not be challenged.

59.    Regarding SB204, the 1Q17 10-Q stated, in relevant part:

We expect that one additional Phase 3 trial may be necessary to support FDA approval of SB204. We are currently assessing trial design enhancements. We are also assessing cost, financial priorities and probabilities of success to determine if and when we will conduct this additional trial.

60.    Then, on June 5, 2017, Novan announced that it was replacing CEO and cofounder Stasko with Martin, a member of the Company's Board, who would become interim CEO, and that Stasko would become the Company's President and Chief Scientific Officer. The Company also announced on June 5, 2017 that it was laying off 20% of its workforce and that despite previously assuring investors that it was committed to SB204, the Company was now executing a plan to turn its focus to earlier-stage compounds that could have applications as topical treatments for inflammatory skin conditions, such as psoriasis and eczema. Specifically, the June 5, 2017 release stated, in relevant part:

*Given our near term business focus on executing less resource intensive phase 2 trials in psoriasis and atopic dermatitis,* and the need to be disciplined with regard to cash utilization, the Company has reduced its overall headcount by approximately 20%. This action will accomplish three things: reduce near term operating costs and preserve cash on our balance sheet, enable refined focus around key projects, and align necessary skills to near term tasks and activities. The Company will continue to evaluate the component parts of the business and adjust

19

resources up or down as needed. Novan continues to believe that the Company's cash on hand is sufficient to fund operations at least through the end of 2017.

Balance sheet focus and sequence:

To be exceedingly clear, the Company will require additional capital in order to proceed on broadening the potential application of the science (nitric oxide) and the underlying technology, and specifically to initiate and complete the planned phase 2 trials in both psoriasis and atopic dermatitis. Additional regulatory clarity surrounding SB204 for acne, as well as both SB206 and SB208, will provide important financial and strategic options as to how the Company strengthens its balance sheet and actively manages other financial considerations.

61.     In response to the Company's June 5, 2017 disclosures, the price of Novan stock dropped 5% to close at $4.64 that day. The stock extended its losses on June 6, 2017, falling an additional 4% to close at $4.45 on June 6, 2017.

62.     On August 2, 2017, the Company hosted a webcast to provide an overall update on Novan. During the webcast, the Company stated it had over $19 million of cash as of June 30, 2017, and that "[s]trengthening of the balance sheet is a near-term goal to enable an increase in operating runway." The webcast also stated that Novan's "[p]rimary clinical focus over the next 24 months" would be "antiviral clinical work in EGW and Molluscum" and that the "[a]cne indication and path forward [would] be largely driven by regulatory clarity."

63.     Following the webcast, the price of Novan stock declined from $5.48 on August 1, 2017 to $4.54 on August 2, 2017, a decline of more than 17%.

64.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

20

acquired Novan securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Novan securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Novan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

21

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Novan;

- whether the Individual Defendants caused Novan to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Novan securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

71.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Novan  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Novan securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

72. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

73. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

74. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

76. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members,

23

as alleged herein; (ii) artificially inflate and maintain the market price of Novan securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Novan securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

77.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Novan securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Novan's finances and business prospects.

78.     By virtue of their positions at Novan , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

79.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of Novan, the Individual Defendants had knowledge of the details of Novan's internal affairs.

80. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Novan. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Novan's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Novan securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Novan's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Novan securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

81. During the Class Period, Novan securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Novan securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Novan securities was substantially lower than the prices paid by Plaintiff and the other

25

members of the Class. The market price of Novan securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

82. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

84. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85. During the Class Period, the Individual Defendants participated in the operation and management of Novan, and conducted and participated, directly and indirectly, in the conduct of Novan's business affairs. Because of their senior positions, they knew the adverse non-public information about Novan's misstatement of income and expenses and false financial statements.

86. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Novan's financial condition and results of operations, and to correct promptly any public statements issued by Novan which had become materially false or misleading.

87.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Novan disseminated in the marketplace during the Class Period concerning Novan's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Novan to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Novan within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Novan securities.

88.    Each of the Individual Defendants, therefore, acted as a controlling person of Novan.  By reason of their senior management positions and/or being directors of Novan, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Novan to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Novan and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

89.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Novan.

## COUNT III

**(Violations of Section 11 of The Securities Act Against All Defendants)**

90.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

91.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Individual Defendants.

27

92. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

93. Novan is the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

94. As issuer of the shares, Novan is strictly liable to Plaintiff and the Class for the misstatements and omissions.

95. None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

96. By reasons of the conduct herein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

97. Plaintiff acquired Novan securities pursuant and/or traceable to the Registration Statement for the IPO.

98. Plaintiff and the Class have sustained damages. The value of Novan securities has declined substantially subsequent to and due to the Individual Defendants' violations.

## COUNT IV

**(Violations of Section 15 of The Securities Act Against the Individual Defendants)**

99. Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

100. This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

28

101. Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Novan within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause Novan to engage in the acts described herein.

102. Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

103. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 24, 2017

Respectfully submitted,

**SCHILLER & SCHILLER, PLLC**

By:    /s/ David G. Schiller
David G. Schiller (NCSB # 26713)
304 East Jones Street
Raleigh, North Carolina 27601
Telephone: (919) 789-4677
Facsimile:  (919) 789-4469
Email: david@schillerfirm.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
       ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

*Attorneys for Plaintiff*

30